# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| UNILOC USA, INC. and UNILOC LUXEMBOURG, S.A. | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 2:16-CV-00393 |
| | § | LEAD CASE |
| AVG TECHNOLOGIES USA, INC. | § § | |
| *Defendant,* | § § | |
| v. | § § | Case No. 2:16-CV-00741 |
| | § | LEAD CASE |
| ADP, LLC | § § | |
| *Defendant.* | § § | |

## MEMORANDUM OPINION AND ORDER

On August 10, 2017, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent Nos. 6,324,578 ("the '578 Patent"), 6,728,766 ("the '766 Patent"), 6,510,466 ("the '466 Patent"), and 7,069,293 ("the '293 Patent") (collectively "the Asserted Patents").[1]  The Court has considered the arguments made by the parties at the hearing and in their claim construction briefs.  Docket Nos. 140, 150, 155, 174, 185 & 190.[2]  The Court has also considered the intrinsic evidence and made subsidiary factual findings about the extrinsic

---

[1] The '466 and '293 Patents share a common specification.  Unless otherwise noted, citations related to either of these patents are made collectively to the '466 Patent.  Similarly, the '578 and '766 Patents share a common specification.  Unless otherwise noted, citations related to either of these patents are made collectively to the '578 Patent.

[2] Citations to the parties' filings are to the filing's number in the docket (Docket No.) and pin cites are to the page numbers assigned through ECF in Case No. 2:16-CV-393.

evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). The Court issues this Claim Construction Memorandum and Order in light of these considerations.

TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................ 4

II.     APPLICABLE LAW ............................................................................................... 7

III.    CONSTRUCTION OF AGREED TERMS ..................................................... 10

IV.     RELEVANCE OF THE PROSECUTION FILE HISTORY IN RELATED PATENTS. 11

V.      CONSTRUCTION OF DISPUTED TERMS .................................................. 14

        1.    "application program(s) / application(s)" ..................................... 14

        2.    "application launcher program" ................................................... 23

        3.    "make the application program available for use" ....................... 31

        4.    "registration operations" ............................................................. 38

        5.    "the initiating execution step" ..................................................... 44

        6.    "the computer readable program code means for executing the application
              program" / "the computer readable program code means for initiating execution"
              / "the means for executing the application program" / "the means for initiating
              execution" ................................................................................... 51

        7.    "license availability" ................................................................... 55

        8.    "an instance" / "an instance of the application program" / "an instance of the
              selected one of the plurality of application programs" and "provid[e]/[ing]" .... 59

VI.     CONCLUSION .......................................................................................... 68

# I. BACKGROUND

## A. The '578 Patent

The '578 Patent was filed on December 14, 1998, issued on November 27, 2001, and is titled "Methods, Systems, and Computer Program Products for Management of Configurable Application Programs on a Network." The '578 Patent relates to obtaining user and administrator preferences for the application programs installed at a server and providing these preferences along with an instance of the application program to a client for execution. *See, e.g.*, '578 Patent, col. 3:50–4:5.

Claim 1 of the '578 Patent is an exemplary claim and recites the following elements (disputed term in italics):

> 1. A method for management of configurable *application programs* on a network comprising the steps of:
> receiving an *application launcher program* associated with an *application program* having a plurality of configurable preferences from a server;
> providing a user set of the plurality of configurable preferences from one of the plurality of authorized users executing the *application launcher program* to the server; and
> requesting that the server *provide an instance of the application program* and a stored user set and an administrator set of the plurality of configurable preferences for use in executing the *application program* responsive to a request from the one of the plurality of authorized users.

## B. The '466 Patent

The '466 Patent was filed on December 14, 1998, issued on January 21, 2003, and is titled "Methods, Systems, and Computer Program Products for Centralized Management of Application Programs on a Network." The '466 Patent relates to installing application software on a server, and providing instances of that software to clients for execution via a user desktop interface with display regions associated with the installed software. *See, e.g.*, '466 Patent, col. 3:48–50, 4:39–44.

Claim 15 of the '466 Patent is an exemplary claim and recites the following elements (disputed term in italics):

> 15. An *application program* management system for managing *application programs* on a network including a server and a client comprising:
>
> means for installing a plurality of *application programs* at the server;
>
> means for receiving at the server a login request from a user at the client;
>
> means for establishing a user desktop interface at the client associated with the user responsive to the login request from the user, the desktop interface including a plurality of display regions associated with a set of the plurality of *application programs* installed at the server for which the user is authorized;
>
> means for receiving at the server a selection of one of the plurality of *application programs* from the user desktop interface; and
>
> means for *providing an instance of the selected one of the plurality of application programs* to the client for execution responsive to the selection.

## C. The '766 Patent

The '766 Patent was filed on April 10, 2001, issued on April 27, 2004, and is titled "Methods, Systems, and Computer Program Products for License Use Management on a Network." The '766 Patent relates to maintaining license related policies and information in the client-server environment for the installed software such that license availability can be communicated to clients on a user-specific basis. *See, e.g.*, '578 Patent, col. 3:24–28, 3:40–45, 5:38–60.

Claim 7 of the '766 Patent is an exemplary claim and recites the following elements (disputed term in italics):

> 7. A license use management system for a network comprising:
>
> means for maintaining license management policy information for a plurality of *application programs* at a license management server, the license management policy information including at least one of a user identity based

policy, an administrator policy override definition or a user policy override definition;

means for receiving at the license management server a request for a *license availability* of a selected one of the plurality of *application programs* from a user at a client;

means for determining the *license availability* for the selected one of the plurality of *application programs* for the user based on the maintained license management policy information; and

means for providing an unavailability indication to the client responsive to the selection if the *license availability* indicates that a license is not available for the user or an availability indication if the licensed availability indicates that a license is available for the user.

### D.    The '293 Patent

The '293 Patent was filed on May 31, 2001, issued on June 27, 2006, and is titled "Methods, Systems, and Computer Program Products for Distribution of Application Programs to a Target Station on a Network."  The '293 Patent relates to the distribution of application programs to a target station (*e.g.*, an on-demand server) from a centralized network management server.  *See, e.g.*, '466 Patent at 5:29–54.

Claim 1 of the '293 Patent is an exemplary claim and recites the following elements (disputed term in italics):

1. A method for distribution of *application programs* to a target on-demand server on a network comprising the following executed on a centralized network management server coupled to the network:

providing an *application program* to be distributed to the network management server;

specifying a source directory and a target directory for distribution of the *application program*;

preparing a file packet associated with the *application program* and including a segment configured to initiate *registration operations* for the *application program* at the target on-demand server; and

distributing the file packet to the target on-demand server to *make the application program available for use* by a user at a client.

## II.    APPLICABLE LAW

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).   To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).   The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent.  *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.' " *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)).  First, a term's context in the asserted claim can be instructive.  *Phillips*, 415 F.3d at 1314.  Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent.  *Id.*

Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.' " *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, " '[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.' " *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic*

*Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g.*, *Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B.      Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence,

must "inform those skilled in the art about the scope of the invention with reasonable certainty."

*Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 2124. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Id.* at 2130 n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

### III.    CONSTRUCTION OF AGREED TERMS

The parties agreed to the construction of the following phrase:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "a segment configured to initiate registration operations" <br><br> ('293 Patent, claims 1, 12, 17) | "portion of the file packet that includes software to initiate registration operations" |
| "license management policy information" <br><br> ('766 Patent, claims 1, 7, 13) | "a set of rules that determine whether users can obtain a license to use a particular application" |
| "license management server" <br><br> ('766 Patent, claims 1, 7, 13) | "a server that determines license availability based on license management policy information" |
| "centralized network management server" <br><br> ('293 Patent, claims 1, 12, 17) | "centralized server for managing the network" |
| "on demand server" <br><br> ('766 Patent, claims 3, 9, 15) | "a server delivering applications as needed responsive to user requests as requests are received" |
| "target on-demand server" <br><br> ('293 Patent, claims 1, 12, 17) | "a server delivering applications as needed responsive to user requests as requests are received at the server, where those applications |

| | are distributed from a centralized network management server" |
|---|---|
| "installing a plurality of application programs at the server"<br><br>('466 Patent, claims 1, 15, 16) | plain and ordinary meaning |
| "installing [an / a second] application program having a plurality of configurable preferences and a plurality of authorized users on a server coupled to the network"<br><br>('578 Patent, claims 1, 14, 15,17, 30, 32, 45) | plain and ordinary meaning |
| "authorized user" / "[for which the] user [is (not)] authorized"<br><br>('466 Patent, claims 1, 2, 8, 15, 17, 23; '578 Patent, claims 1, 7, 10, 12–17, 23, 26, 32, 38, 41-46) | plain and ordinary meaning |
| "user set"<br><br>('578 Patent, claims 1, 2, 4, 6, 8, 10, 11, 14-18, 20, 22, 24, 26, 30–33, 35, 37, 39, 41, 42, 45, 46) | plain and ordinary meaning |

Docket Nos. 159-1 at 8–10; 159-2 at 10–12. In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the parties' agreed construction.

## IV.    RELEVANCE OF THE PROSECUTION FILE HISTORY IN RELATED PATENTS

The parties dispute whether the prosecution histories of the '466 and '766 Patents are relevant for construing the terms in the '578 and '293 Patents. As background, the '578 and '466 Patents were filed on the same day. The specification of the '578 Patent states that "[t]his application is related to the following application filed concurrently herewith: [the '466 Patent]." '578 Patent at 1:6–13. Similarly, the specification of the '466 Patent states that "[t]his application

is related to the following application filed concurrently herewith: [the '578 Patent]." '466 Patent at 1:6–12. Moreover, the specification of the '578 Patent incorporates by reference the '466 Patent. '578 Patent at 7:17–21, 11:27–30. Likewise, the specification of the '466 Patent incorporates by reference the '578 Patent. '466 Patent at 7:41–48, 11:17–26. Furthermore, the '293 Patent is a divisional of the '466 Patent, and the patents share a common specification. Similarly, the '766 Patent is a divisional of the '578 Patent, and the patents share a common specification.

Plaintiffs argue that the prosecution histories of the '466 and '766 Patents are irrelevant and should be disregarded because they "form[] no part of the prosecution history of the '578 or '293 [P]atents." Docket No. 155 at 8. In the alternative, Plaintiffs argue that "[t]hose prosecution histories can be considered, but only as extrinsic evidence . . . ." Docket No. 190 at 4 (citing *C&C Jewelry MFG, Inc. v. West*, 2010 WL 2681921, *1 (N.D. Cal. 2010)). During the claim construction hearing, Plaintiffs suggested that the issue was not adequately briefed by the parties.[3]

The Court disagrees and finds that Defendants provide persuasive authority and arguments to support their position that the prosecution histories of the '466 and '766 Patents are relevant to the construction of identical terms used in the related '578 and '293 Patents.

Specifically, Defendants cite to *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007), to support their contention that disclaimers of claim scope in one patent apply to related patents. Docket No. 185 at 8. The *Verizon* court summarized the facts in that case as follows:

> The claims of the '880 patent originated in U.S. patent application No. 08/814,291 ("'291 application"). During prosecution the examiner issued a restriction requirement on the ground that the '291 application covered two independent and

---

[3] Notwithstanding Plaintiffs' suggestion, the Court provided the parties with ample opportunity to brief the issue of whether the prosecution histories of the '466 and '766 Patents are relevant to the construction of identical terms in the related '578 and '293 Patents. Furthermore, the Court specifically inquired about the issue during the claim construction hearing.

distinct inventions. The applicants then filed divisional application No. 09/363,750 ("'750 application"), pursuing some of the claims of the original '291 application, which was allowed as the '880 patent. The remainder of the claims of the original '291 application in turn matured into U.S. Patent No. 6,542,497 ("'497 patent"). The claims of both applications require a "localized wireless gateway system." During prosecution of the '291 application the applicants' claims were rejected based on prior art wireless gateway systems.

The applicants gained allowance of the claims of the '291 application after stating that the prior art systems "all appear to be directed to non-localized systems," and that the "present invention," by contrast, was "restricted to operate within a few feet from a base station (i.e. wireless handsets)."

*Verizon*, 503 F3d at 1306-1307. Given this background, the court in *Verizon* rejected the argument "that the disclaimer in the '291 application process (leading to the '497 patent) should not apply to the '880 patent because it occurred after the '880 patent issued." *Id.* at 1307. The Court held that " 'it is not unsound to apply the same interpretation to th[e] patent[-in-suit],' 'even though [that] patent had already issued.' " *Id.* (quoting *Microsoft Corp. v. Multi-tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004)).

The facts in *Verizon* are analogous to the facts in this case. As in *Verizon*, the '293 Patent is a divisional of the '466 Patent, and the patents share a common specification. Similarly, the '766 Patent is a divisional of the '578 Patent, and the patents share a common specification. Likewise, all four patents require "application program(s);" and the '466, '766 and '578 Patents each require an "application launcher program." Moreover, the specification of the '578 Patent incorporates by reference the '466 Patent, and explicitly states the applications are related. '578 Patent at 1:6–13, 7:17–21, 11:27–30. Likewise, the specification of the '466 Patent incorporates by reference the '578 Patent, and explicitly states the applications are related. '466 Patent at 1:6–12, 7:41–48, 11:17–26.

Contrary to Plaintiffs' contention, a restriction requirement does not automatically isolate the prosecution history of a divisional application from its sibling or related application. Indeed,

in *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340 (Fed. Cir. 2004), the Federal Circuit concluded that "[a]ny statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction, and the relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention." *Id.* at 1350. As discussed above, it cannot be reasonably disputed that the Asserted Patents are related. Accordingly, the Court finds that the prosecution histories of the '466 and '766 Patents are relevant to the construction of identical terms in the related '578 and '293 Patents.[4]

## V. CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of nine terms/phrases in the Asserted Patents.

### 1. "application program(s) / application(s)"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "application program(s) / application(s)" | "code associated with performing function for a user" | "application level software program code for underlying application level functions that executes locally at the client as a separate application from the browser" |

---

[4] Plaintiffs did not provide relevant authority to support their position that the prosecution history of a sibling application that is incorporated by reference should automatically be considered extrinsic evidence. The Federal Circuit has stated that "[i]ncorporation by reference provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). The court further held that the determination of "[w]hether and to what extent material has been incorporated by reference into a host document is a question of law." *Id.* at 1283. For the reasons stated above, the Court finds that the prosecution histories of the '466 and '766 Patents are relevant to the construction of identical terms used in the related '578 and '293 Patents. Accordingly, the Court disagrees that the prosecution histories of the Asserted Patents in this case should be considered in isolation. Instead, the Court will consider the prosecution histories in the context of the disputed terms to avoid reading unnecessary and redundant language into a disputed term.

### a) The Parties' Positions

The parties dispute whether the term "application program" should be limited to "execute[ing] locally at the client as a separate application from the browser," as Defendants propose. Plaintiffs argue that there are two ways a user can execute an application in the network described in the Asserted Patents. Docket No. 140 at 4. The first method includes downloading and executing an application on the client terminal. *Id.* Plaintiffs agree that the asserted claims of the '466 Patent, and claims 3, 9 and 15 of the '766 Patent, are drawn to this first method. *Id.* The second method includes the application remaining on the server and being executed remotely by a user. *Id.* Plaintiffs contend that the claims of the '578 and '293 Patents cover both methods. *Id.*

Plaintiffs argue that all claims of the '466 Patent, and claims 3, 9 and 15 of the '766 Patent, recite language that unambiguously requires execution on the client. *Id.* at 5. Plaintiffs contend that no similar language appears in the claims or prosecution history of the '578 or '293 Patents. *Id.* According to Plaintiffs, the patentees drafted the claims of the '578 Patent to cover either method. *Id.* Plaintiffs further argue that the claims of the '293 Patent are directed to an exchange of applications from a central management server to the remote servers, not from the remote server to the client. *Id.* Plaintiffs contend that those claims do not mention executing the application program. *Id.*

Plaintiffs further argue that nothing in the ordinary and usual meaning of "application" would limit the term to software executed only at the client. *Id.* Plaintiffs contend that applications are frequently executed at remote servers. *Id.* at 6. Plaintiffs argue that the intrinsic record of the '578 and '293 Patents does not contain a definition or disclaimer that would limit the claims. *Id.* at 7. Plaintiffs also argue that nothing in the in the intrinsic record of the '466 or '766 Patents modifies the ordinary and usual meeting of "application." *Id.* Plaintiffs contend that the claims of the '466 Patent are limited to execution on the client because the claims recite this limitation in

specific language. *Id.*

Defendants respond that the '293 and '578 Patents explicitly distinguish the claimed invention from certain prior art centralized software management systems on the basis that applications were executed "at the server rather than the client." Docket No. 150 at 9–10 (citing '578 Patent at 2:50–55, 3:5–8; '466 Patent at 2:52–57). Defendants argue that the patentees could not have intended to claim a system where "applications" were executed at the server. Docket No. 150 at 10. Defendants also argue that the "Summary of the Invention" section of the '293 Patent states that, according to the "present invention," "[t]he application program is then provided from the server and executed at the client." *Id.* (citing '466 Patent at 3:55–4:3). Defendants contend that this provides additional support that the claimed invention was directed specifically to execution of applications at the client. Docket No. 150 at 10.

Defendants further argue that the disclosed embodiments in the '293 and '578 Patents reflect that applications are "distributed" or "delivered" to, and executed at, the client, and that there are no embodiments in which applications are executed at the server. *Id.* (citing '578 Patent at 6:16–25, 11:65–12:1, Figures 2–4; '466 Patent at 6:15–17, 6:22–24, 6:62–64, 9:30–33, 10:3–7, 10:61–64, Figures 3, 4, 6). Defendants contend that Plaintiffs do not cite to any specification to support its position regarding server-side execution. Docket No. 150 at 11.

Defendants further argue that the prosecution histories of the '766 and '466 Patents confirm the patentees' intent to foreclose the possibility of execution at the server. *Id.* at 12. Defendants contend that the patentees repeatedly distinguished the claimed invention because the prior art applications were not provided to the client for execution. *Id.* (citing Docket No. 150-6 at 9–11, 36, 46–47). Defendants also argue that the patentees confirmed this definition of "application program" during prosecution of the '466 Patent. Docket No. 150 at 12 (citing Docket No. 150-5

at 25, 50).  Defendants contend that the patentees argued that an "application program" required both local execution at the client and to be separate from the browser.  Docket No. 150 at 13 (citing Docket No. 150-5 at 27-29, 53-55).  Defendants further argue that the only portion of any of the four file histories to which Plaintiffs cite does not address execution at all.  Docket No. 150 at 13–14.

Plaintiffs reply that the four patents are directed towards four different inventions, with each invention relating to a particular portion of an enterprise computer network.  Docket No. 155 at 2.  Plaintiffs contend that all claims of the '466 Patent incorporate specific language requiring execution at the client.  *Id.*  Plaintiffs further contend that the claims of the '578 and '293 Patents are directed toward inventions that can be practiced in networks where execution is at a server.  *Id.*  Plaintiffs argue that nothing in the ordinary and usual meaning of "application" would limit the term to software executed only at a client.  *Id.* at 2–3.

Plaintiffs further argue that the '578 Patent's criticism of certain mobility systems was because they did not address "the full range of complications which may arise in a heterogeneous network utilizing different devices and connections."  *Id.* at 4 (citing '578 Patent at 3:5–8).  Plaintiffs contend that this limitation of prior art mobility systems would appear to be independent of where applications are executed.  Docket No. 155 at 5 (citing '578 Patent at 3:12–27, 2:35–3:4, 2:50–55).  Plaintiffs argue that the '578 Patent does not criticize executing applications on the server.  Docket No. 155 at 5.  Plaintiffs further contend that the section of the specification entitled "DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS" makes no mention of where the applications are executed.  *Id.* (citing '578 Patent at 6:29–11:22, Figures 2–4).  According to Plaintiffs, this section only describes downloading the "application launcher program," not the application.  Docket No. 155 at 5.  Plaintiffs contend that the only reference in the entire patent to

an embodiment that describes execution at the client is in a section describing the "[a]lternative preferred embodiments . . . described in [the '466] patent application." *Id.* (citing '578 Patent at 11:27–12:36). According to Plaintiffs, this alternate embodiment does not disavow coverage of systems or programs that execute on a server in the claims of the '578 Patent. Docket No. 155 at 5.

Plaintiffs further argue that the '293 Patent is a divisional of the '466 Patent and is directed to "distribution of application programs to a target station on a network." *Id.* at 6. Plaintiffs contend that all claims of the '466 Patent have language unambiguously requiring execution at the client and the '293 Patent does not involve a client. *Id.* at 7. Plaintiffs further contend that embodiments in the shared specification that are executed at the client correspond to the distinct invention of the '466 Patent and where applications are executed is not mentioned in the '293 Patent. *Id.* (citing '466 Patent at 17:17–20:59).

Regarding the prosecution history, Plaintiffs argue that the prosecution history of the '466 Patent can be disregarded because the claim construction issue is limited to claims of the '578 and '293 Patents. Docket No. 155 at 7. Plaintiffs contend that the requirement of execution at the client in the '466 Patent arises from specific language in the '466 Patent's claims requiring execution at the client. *Id.* at 8. According to Plaintiffs, the statements in the prosecution history of the '466 Patent have no relevance to the '578 Patent. *Id.*

Plaintiffs further argue that the prosecution history of the '766 Patent also forms no part of the prosecution history of the '578 or '293 Patents and should be disregarded. *Id.* Plaintiffs contend that the relevant claims of the '766 Patent cover a method or system in which an application launcher program located on the client requests a license availability from a server and then receives from the server an indication of availability or unavailability. *Id.* at 8–9. Plaintiffs

argue that the relevant claims do not discuss execution and the patentees did not distinguish any of those references based on where execution is performed. *Id.* at 9. Plaintiffs also argue that the patentees did not distinguish Franklin on the grounds that its applications were executed on the server, but instead distinguished Franklin on the ground that the application launcher was located on the server. *Id.*

Plaintiffs also contend that the comment regarding the Duvvoori reference was that the reference did not disclose "a configurable instance of an application . . . for execution at the client." *Id.* According to Plaintiffs, the patentees did not distinguish the prior art references on the grounds that applications would be executed at the server because, in both references, the applications were executed at the client, not the server. *Id.* at 9–10 (citing Docket No. 155-3 at 4, 6). Plaintiffs contend that the patentees similarly described Duvvoori as describing "an agent process . . . at the client that controls execution programs resident on the clients." Docket No. 155 at 10 (citing Docket No. 155-4 at 4). Plaintiffs argue that the patentees never described either reference as executing programs at the server. Docket No. 155 at 10. Plaintiffs also argue that the patentees' statement distinguishing Duvvoori related to that reference not having an application launcher located on the client. *Id.*

For the following reasons, the Court finds that the term **"application program(s) / application(s)"** should be construed to mean **"the code associated with the underlying program functions that is a separate application from a browser interface and does not execute within the browser window."**

### b) Analysis

The term "application program(s) / application(s)" appears in claims 1–4, 8–9, 13, 15, 16–19, 23–24, 28, 30–32, 36–37 and 41 of the '466 Patent; claims 1–3, 7–9 and 13–15 of the '766

Patent; claims 1, 2, 4, 5, 7, 11–18, 20, 21, 23, 27–33, 35, 36, 38 and 42–46 of the '578 Patent; and

claims 1, 12 and 17 of the '293 Patent. The Court finds that the term is used consistently in the

claims and is intended to have the same general meaning in each claim. The Court further finds

that the specification provides an explicit definition for the term. Both the '578 and '466 Patents

state that "as used herein, it is to be understood that the term 'application program' generally refers

to the code associated with the underlying program functions, for example, Lotus Notes or a

terminal emulator program." '578 Patent at 12:13–16; '466 Patent at 14:24–27.

The patentees also argued during the prosecution of the '466 Patent that "the application

launcher program interacts with the desktop, such as a user browser interface, while *an instance*

*of the application program* is requested through the desktop but executes locally at the client *as a*

*separate application from the browser interface*. For example, Lotus Notes *would not execute*

*within the browser window*." Docket No. 150-5 at 25, 50 (emphasis added). Accordingly, the

Court construes the term "application program(s) / application(s)" to mean "code associated with

the underlying program functions that is a separate application from a browser interface and does

not execute within the browser window."

The Court rejects Defendants' proposal of "executes locally at the client" because it would

unnecessarily add a limitation to the term "application program." The intrinsic evidence indicates

that the application programs are stored at the server. For example, the Summary of the Invention

of the '466 Patent states that "[a] plurality of application programs are installed at the server."

'466 Patent at 4:24–25. The specification further states that "[t]he server receives a selection of

one of the plurality of application programs from the user desktop interface and *provides an*

*instance of the selected one of the plurality of application programs to the client for execution*

*responsive to the selection*." *Id.* at 4:34–38 (emphasis added). Thus, it is an "instance of the

application program" that is "executed locally at the client."  Indeed, as discussed above, the patentees argued during the prosecution of the '466 Patent that "the application launcher program interacts with the desktop, such as a user browser interface, *while an instance of the application program is requested* through the desktop *but executes locally at the client* as a separate application from the browser interface."  Docket No. 150-5 at 25, 50 (emphasis added).  The claims of the '466, '766 and '578 Patents explicitly recite either "provid[es]/[ing] an instance of the application program" or "providing an instance of the selected one of the plurality of application programs."  Thus, it would be improper to redraft the claims to read "executes locally" into the term "application program."

Defendants argue that the "Background of the Invention" sections of both the '293 and '578 Patents explicitly distinguish the claimed invention from certain prior art centralized software management systems on the basis that applications were executed "at the server rather than the client."  Docket No. 150 at 9–10.  Contrary to Defendants' contention, this section of the specification does not provide a clear and unambiguous disavowal of the suggested claim scope.  Instead, this section describes a number of prior art systems.  *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply . . . if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features.").  For example, the "Background of the Invention" section also describes prior art systems in which the application program is transmitted from a server to a client.  '578 Patent at 1:62–2:6 ("In addition, the Systems Management Server (SMS) program from Microsoft Corporation provides an ability to transmit an application program from a server to a number of clients.  The SMS system typically allows installation of programs and associated icons at client stations for SMS-enabled applications.").

Defendants further argue that the prosecution histories of the '766 and '466 Patents confirm the patentees' intent to foreclose the possibility of execution at the server. Docket No. 150 at 12. Defendants contend that "the Applicants repeatedly distinguished the claimed invention from the prior art on the basis that the prior art applications were not provided to the client for execution." *Id.* The Court disagrees with Defendants' analysis of the prosecution history. In fact, contrary to Defendants' contention, the patentees argued that the Christiano reference "appears to describe an environment in which *the program's executable is already on the client* and the client obtains 'authorization . . . to use or 'implement' (run) a single designated software product.' " Docket No. 150-6 at 11 (emphasis added) (citation omitted). Thus, the patentees argued that the prior art included an application program executed on the client, and they did not distinguish the claims on this basis. Instead, the patentees distinguished the Christiano reference because it did not disclose "receiving the request from an application launcher program." *Id.* Similarly, the patentee distinguished the Franklin and Duvvoori references because they did not request an instance of the application. *Id.* at 11, 36, 54.

Regarding the prosecution history of the '466 Patent, Defendants contend that the Applicants were explicit that the "application" of the invention executed locally at the client. Docket No. 150 at 13. Defendants focus on an incomplete portion of the patentees' statement. The patentees argued that "the application launcher program interacts with the desktop, such as a user browser interface, *while an instance of the application program is requested through the desktop but executes locally at the client* as a separate application from the browser interface." Docket No. 150-5 at 25, 50. As indicated, it is "an instance of the application program" that "executes locally at the client," not the recited "application program." The claims of the '466, '766 and '578 Patents explicitly recite "provid[es]/[ing] an instance of the application program"

or "providing an instance of the selected one of the plurality of application programs." Thus, it would be improper to redraft the claims to read in "execute locally" into the term "application program."

### c) Court's Construction

The Court construes the term **"application program(s) / application(s)"** to mean **"the code associated with the underlying program functions that is a separate application from a browser interface and does not execute within the browser window."**

### 2. "application launcher program"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal[5] |
|---|---|---|
| "application launcher program" | "a program distributed to a client to initially populate a user desktop and to request execution of the application program" | "a program distributed to a client to initially populate a user desktop and to request the application program from a server" |

### a) The Parties' Positions

The parties dispute whether the term "application launcher program" should be limited "to request the application program from a server," as Defendants propose, or whether the term merely "request(s) execution of the application program," as Plaintiffs propose. Plaintiffs argue that the '578 Patent describes a launcher as a program that the server distributes to a client to "initially populate the user desktop" by "provid[ing] for a user interface" (*e.g.*, displaying an icon that corresponds to the application) "to execute the application." Docket No. 174 at 2 (citing '578 Patent at 12:26–27, 3:64–4:2). Plaintiffs contend that the program is called a "launcher" because when the user "selects" the application, the launcher requests execution of ("launches") the application itself. Docket No. 174 at 2–3 (citing '578 Patent at 4:6–9, 8:14–17, 10:58–62).

---

[5] Defendant Kaspersky Lab, Inc. indicates that it does "not join in [Defendants' supplemental] brief, and proposes that the Court adopt Uniloc's construction of the two terms addressed herein." Docket No. 185 at 4 n.1.

Plaintiffs also argue that the '578 Patent describes the launcher as providing user information to the server "along with the request to initiate execution of the application." Docket No. 174 at 3 (citing '578 Patent at 4:6–9). Plaintiffs contend that Defendants' proposal is not mentioned until later in the patent, and then only as a characteristic of an "alternative" embodiment. Docket No. 174 at 3 (citing '578 at 11:60–12:1, 11:27–30). According to Plaintiffs, Defendants' construction describes only one embodiment. Docket No. 174 at 4.

Plaintiffs further argue that Defendants' construction does not cover all launchers and would not cover launchers that request execution at the server. *Id.* Plaintiffs contend that when an application is executed at the server, the launcher would not request the application from the server. *Id.* According to Plaintiffs, the launcher would need only provide the server with a "request to initiate execution of the application." *Id.* Plaintiffs agree that the specification describes an embodiment in which the launcher requests an application from the server but argues that the '578 Patent describes this as alternative preferred embodiment. *Id.* (citing '578 Patent at 11:65–12:1, 11:27–30).

Plaintiffs further argue that the specification includes an embodiment in which the launcher distributed to the client includes the entire application provided by the vendor. Docket No. 174 at 4 (citing '466 Patent at 14:32–34). According to Plaintiffs, that launcher would not "request the application" from the server, because that launcher already includes the application. Docket No. 174 at 4. Plaintiffs contend that there is nothing in the specification to suggest that the inventors would have wanted to exclude this embodiment. *Id.* at 5.

Defendants respond that "application launcher program" is not a term of art, but instead is an expression coined by the patentees specifically for these patents. Docket No. 185 at 5–6. Defendants contend that the same claim term used in related patents is presumed to carry the same

construed meaning. *Id.* at 6. Defendants argue that an application launcher program allows a client to request an instance of an application from a server for execution at a client. *Id.* (citing '466 Patent at 16:18–29; '578 Patent 11:60–12:1, 11:32–12:4). According to Defendants, no embodiment in either specification expressly states that an application launcher program is used to execute programs on a server. Docket No. 185 at 6.

Defendants further argue that Plaintiffs take the phrase "request to initiate execution of the application" out-of-context and Plaintiffs ask the Court to hypothesize that execution could take place on the server itself. *Id.* at 7 (citing '578 Patent at 4:6–9). Defendants also argue that the full passage specifies that the server responds by "providing an instance of the application program for execution." Docket No. 185 at 7 (citing '578 Patent at 10:9–12). Defendants contend that the request is received by an "on-demand server," which the specification defines as a server "delivering" applications to clients, not executing applications itself. Docket No. 185 at 7 (citing '578 Patent 4:15–18, 6:51–53). According to Defendants, it is the client that executes an application program following its delivery by the on-demand server. Docket No. 185 at 7.

Defendants argue that server-side execution is expressly discussed in the Asserted Patents only in the "Background of the Invention," in which the patentees distinguish prior art mainframe systems whose applications were executed "at the server rather than the client." Docket No. 185 at 7 (citing '578 Patent at 2:50–55, 3:5–8;'466 Patent 2:52–57). Defendants also argue that the patentees repeatedly assigned to the application launcher program the function of distributing applications to clients. Docket No. 185 at 7. Defendants contend that when a specification exclusively assigns functions to certain claimed elements, that assignment should be reflected in that element's claim construction. *Id.*

Defendants further argue that the patentees disavowed embodiments in which application

launcher programs initiate server execution of applications. *Id.* Defendants contend that during prosecution of the '766 Patent the patentees defined the application launcher program to require local execution. *Id.* Defendants argue that the patentees repeatedly relied on local distribution of applications to distinguish this "application launcher program" from cited prior art application launchers. *Id.* Defendants contend that the patentees distinguished the application launcher of Franklin as a "launcher . . . that merely accesses applications which are stored and launched from a server," while characterizing the claimed application launcher program as one that "populates clients." *Id.* (citing Docket No. 150-6 at 11–12).

Defendants also argue that the patentees attempted to distinguish the Duvoori reference because that reference's application "wrapper" failed to "request a configurable instance of an application from a server for execution at the client as with the recited application launcher programs of the present invention." Docket No. 185 at 8–9 (citing Docket No. 150-6 at 36). Defendants also contend that, on appeal, the patentees repeated their arguments regarding Duvoori and further distinguished the Christiano reference as lacking "an application launcher program that obtains 'the application program's executable code from the server on-demand.' " Docket No. 185 at 9 (citing Docket No. 150-6 at 52). According to Defendants, each of these arguments makes clear that the patentees intended the term "application launcher program" to mean a program that requests application programs from a server.

Defendants also argue that Plaintiffs incorrectly suggest that Defendants' construction reads out an embodiment in the '578 Patent "where the launcher distributed to the client includes the entire application the vendor provided." Docket No. 185 at 9 (citing '466 Patent at 14:32–34). According to Defendants, this passage indicates that the application launcher program may be an "entire program provided by a software vendor" (*i.e.*, to perform all operations associated with

application requests) or "merely a portion" of such program "distributed to a client to perform particular operations" (*i.e.*, a subset of operations associated with application requests). Docket No. at 185 at 9 (citing '466 Patent at 14:32–41). Defendants contend that the specifications never describe an application launcher program as Plaintiffs contend, and that Plaintiffs' proposed broadening construction is improper. Docket No. at 185 at 9.

Plaintiffs reply that Defendants refer to an "alternative preferred embodiment" as the only mention of where execution refers to downloading an application for execution at the client. Docket No. 190 at 3 (citing '578 Patent at 11:27–12:36). Plaintiffs contend that the specification does not otherwise mention location of execution. Docket No. 190 at 3. Plaintiffs argue that whether applications are executed at the server or at the client would be irrelevant to the claimed invention of the '578 Patent. *Id.* Plaintiffs further argue that all claims of the '466 Patent recite "providing an instance of the . . . application . . . to the client for execution" because that patent is directed to a different invention, which incorporates that feature. *Id.* Plaintiffs contend that references to that feature in the '466 Patent would not disavow the full scope of claims of the '578 Patent. *Id.*

Plaintiffs further argue that the '578 Patent issued on a first office action and that nothing in its prosecution history could disavow anything. *Id.* at 4. Plaintiffs contend that the prosecution histories of the '466 and '766 Patents can be considered, but only as extrinsic evidence as they were not part of the negotiation with the PTO to obtain the claims of the '578 Patent. *Id.* According to Plaintiffs, there are no statements in those prosecution histories that would clearly and unmistakably disavow the scope of any claims of the '578 Patent. *Id.*

For the following reasons, the Court finds that the term **"application launcher program"** should be construed to mean **"a program distributed to a client to initially populate a user**

**desktop and to request an instance of the application for execution at the client."**

      **b) Analysis**

The term "application launcher program" appears in claims 3, 6, 10, 18, 21, 25, 31, 34 and 38 of the '466 Patent; claims 2, 8 and 14 of the '766 Patent; and claims 1, 4–5, 11–17, 20–21, 27–32, 35–36 and 42–46 of the '578 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that the term "application launcher program" is not a term of art, but instead is a term coined by the patentees for the Asserted Patents.

The parties agree that the term should at least be construed to mean "a program distributed to a client to initially populate a user desktop." The Court agrees. The '578 and '466 Patents state that "the application launcher program distributed to initially populate the user desktop preferably does not include the code associated with the underlying application program." '578 Patent at 12:26–29; '466 Patent at 14:36–38. The specification of the '466 Patent also states that "[p]referably, the application launcher program, as described above, is distributed for each authorized application program to the client station 202 at the time of establishment of the user desktop interface without including all of the executable code of each application as part of the application launchers at the time of distribution." '466 Patent at 16:13–18. Accordingly, the intrinsic evidence indicates that the "application launcher program" is "a program distributed to a client to initially populate a user desktop."

The Court further finds that the intrinsic evidence indicates that the "application launcher program" requests an instance of the application for execution at the client. For example, the '578 Patent specification states that "[t]he application launcher applet then detects selection by the user of the application program's associated icon from the user desktop interface at clients 24, 24', 26,

26' and requests an instance of the selected one of the plurality of application programs associated with the icon from server system 22. The application launcher program *then populates clients 24, 24', 26, 26' with the instance of the selected application program for execution*." '578 Patent at 11:60–12:1 (emphasis added). Likewise, the '466 Patent specification states that "[t]he application launcher applet then detects selection by the user of the application program's associated icon from the user desktop interface at client station 202 and requests an instance of the selected one of the plurality of application programs associated with the icon from server system 22. The application launcher program *then populates client station 202 with the instance of the selected application program for execution*." '466 Patent at 16:18–25 (emphasis added).

Moreover, the patentees argued during the prosecution of the '766 Patent that the prior art failed to disclose an application launcher program that requests an instance of the application for execution at the client. Specifically, the patentees argued that "while the wrappers of Duvvoori may request a license, *they do not request a configurable instance of an application from a server for execution at the client as with the recited application launcher programs of the present invention*." Docket No. 150-6 at 36, 54 (emphasis added). Likewise, the patentee argued that "the launcher recited in Franklin is a server-based resource that merely accesses applications which are stored and launched from a server" and does not disclose a launcher that "requests an instance of the selected one of the plurality of application programs . . . from server system 22." *Id.* at 11. Similarly, the patentee argued that " 'receiving the request from an application launcher program' is not disclosed in or suggested by Christiano." *Id.* at 11.

The patentees also made similar arguments during the prosecution of the '466 Patent. Specifically, the patentees argued that "the application launcher program interacts with the desktop, such as a user browser interface, while *an instance of the application program is*

*requested through the desktop but executes locally at the client . . . ."* Docket No. 150-5 at 25, 50 (emphasis added). The patentee also distinguished the Win reference by arguing that "no selection received at the server of such an application program and no 'providing an instance of the selected' application program 'to the client for execution' is taught or suggested by Win." *Id.* at 27. Accordingly, the intrinsic evidence indicates that "application launcher program" should be construed to mean "a program distributed to a client to initially populate a user desktop and to request an instance of the application for execution at the client."

Plaintiffs argue that the specification of the '578 Patent describes the launcher as providing user information to the server "along with the request to initiate execution of the application." Docket No. 174 at 3 (citing '578 Patent at 4:6–9). The problem with Plaintiffs' argument is that the quote does not indicate where the execution takes place. In fact, the specification indicates that the server responds by "providing an instance of the application program for execution." '578 Patent at 10:9–12. Furthermore, the request is received by an "on-demand server," which the specification defines as a server "delivering" applications to clients, not executing applications itself. '578 Patent at 4:15–18, 6:51–53. Indeed, Plaintiffs concede that the '578 Patent only mentions downloading an application for execution at the client, and does not otherwise mention location of execution. Docket No. 190 at 3. The Court is cognizant that to impose a limited construction, it is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). However, as indicated above, the intrinsic evidence indicates that the application launcher program requests an instance of the application for execution at the client. *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the

written description and the prosecution history.").

### c) Court's Construction

The Court construes the term **"application launcher program"** to mean **"a program distributed to a client to initially populate a user desktop and to request an instance of the application for execution at the client."**

### 3. "make the application program available for use"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal[6] |
|---|---|---|
| "make the application program available for use" | "make the application program available for use" | **Bitdefender, Piriform, ADP, LLC, Blackboard, Box, and Zendesk**<br>"make the application available for access and download, responsive to user requests"<br><br>**Ubisoft, Square Enix, Big Fish**<br>"identify the individual users to which the application program is available for execution" |

### a) The Parties' Positions

The parties dispute whether the phrase "make the application program available for use" requires construction. Plaintiffs argue that a user would select an application by clicking the corresponding icon on his desktop, and if that application is "available for use," it could either be executed at the server or downloaded to the client for execution. Docket No. 174 at 5. Plaintiffs contend that Defendants' proposal of "download" would improperly narrow the claims to exclude systems that execute the application at the server. *Id.* Plaintiffs note that the claims were amended

---

[6] Defendant Kaspersky Lab, Inc. indicated that it did "not join in [Defendants' supplemental] brief, and proposes that the Court adopt Uniloc's construction of the two terms addressed herein." Docket No. 185 at 4 n.1.

to add the language in dispute.  *Id.* at 6 (citing Docket No. 174-2 at 6–7).  Plaintiffs argue that the amendment was not intended to prescribe where applications would be executed.  Docket No. 174 at 6 (citing Docket No. 174-2 at 8).  According to Plaintiffs, the added language was intended to clarify that the application was not merely distributed to the server, but distributed in a way that it would be recognized and available to users.  Docket No. 174 at 6.

Plaintiffs further argue that in the prosecution of the '466 Patent, the PTO issued a restriction requirement, finding that the claimed invention of the '293 Patent was distinct from the '466 Patent claims.  *Id.* at 7.  Plaintiffs contend that the portions of the '466 Patent that appear to pertain exclusively to the '293 Patent claims do not mention where applications are executed.  *Id.* (citing '466 Patent at 3:47–50, 4:10–21, 5:28–54, 6:28–39, 17:18–20:59, Figures 8–10).  Plaintiffs argue that the patentees directed the four patents-in-suit to separate, distinct inventions.  Docket No. 174 at 8.  According to Plaintiffs, the '578 and '293 Patents are agnostic as to where the applications are executed.  *Id.*

Defendants Bitdefender, Piriform, ADP, LLC, Blackboard, Box and Zendesk (collectively "the First Group of Defendants") argue that the phrase should require making "the application available for access and download, responsive to user requests."  Docket No. 185 at 10.  The First Group of Defendants contend that the claims relate to an "on-demand" server that delivers applications "as needed responsive to user requests as requests are received."  *Id.* (citing '466 Patent at 6:62–64).  The First Group of Defendants argue that no embodiment of an on-demand server expressly describes the remote "use" of an application on a server.  Docket No. 185 at 10.  The First Group of Defendants further contend that the '293 Patent repeatedly confirms that an on-demand server delivers or distributes an application (*i.e.,* by download) for execution at the client.  *Id.* (citing '466 Patent at 3:64–4:3, 6:15–17, 6:22–24, 10:61–64).

The First Group of Defendants further argue that during the prosecution of the '466 Patent the patentees made multiple statements characterizing the invention as accessing and downloading selected application programs for local execution at the client. Docket No. 185 at 10 (citing Docket No. 150-5 at 25, 50). The First Group of Defendants also contend that the patentees defined "the invention" as involving "access[ing] and download[ing] selected application programs." Docket No. 185 at 10 (citing Docket No. 150-5 at 8). The First Group of Defendants also argue that the patentees defined "application programs" as application level software programs that "execute[] locally at the client as a separate application from the browser interface." Docket No. 185 at 11 (citing Docket No. 150-5 at 25).

The First Group of Defendants further argue that Plaintiffs' restriction requirement argument did not address where applications are executed and did not invite the patentees to adopt a different meaning for an "application program" across the two applications. Docket No. 185 at 11. The First Group of Defendants further argue that Plaintiffs' construction presumes that two independent and potentially incompatible inventions were filed in the same specification, and were described in alternating paragraphs throughout the specification. *Id.* The First Group of Defendants contend that the natural reading is that the managed local applications of the '466 Patent are distributed in the '293 Patent by downloading them to the client for use. *Id.* at 12.

The First Group of Defendants also argue that Plaintiffs' supplemental briefing for the "available for use" term also contains a misleading quote. *Id.* The First Group of Defendants argue that the patentees only cited "page 28, lines 3–4" of the original specification, corresponding to the '466 Patent at 17:47–49, and not to the "'466 patent at 17:40–49," as Plaintiffs contend. *Id.* (citing Docket No. 150-7 at 8). The First Group of Defendants argue that Plaintiffs arbitrarily exclude the immediately preceding sentence in the same paragraph, which recites that this very

embodiment "provides server and client software for distributing a software package from a server to a list of Tivoli<sup>TM</sup> clients." Docket No. 185 at 12 (citing '466 Patent at 17:35–40). The First Group of Defendants also contend that the portion of the file history relied on by Plaintiffs supports their position that the phrase "make the application program available for use" was intended to convey the availability of programs for distribution (*i.e.*, download) to one or more clients. Docket No. at 185 at 12.

Defendants Ubisoft, Square Enix, and Big Fish (collectively "the Second Group of Defendants") argue that the phrase could be construed to mean "identify the individual users to which the application program is available for execution." *Id.* at 13. The Second Group of Defendants contend that the phrase has a specific meaning in the context of the '293 Patent. *Id.* The Second Group of Defendants argue that the independent claims of the '293 Patent require "preparing a file packet associated with the application program and including a segment configured to initiate registration operations for the application program" and "distributing the file packet to the target on-demand server to make the application program available for use by a user at a client." *Id.* According to the Second Group of Defendants, the file packet that is distributed to the on-demand server to make the application program "available for use by a user at a client" is the same file packet that is prepared and includes a "segment configured to initiate registration operations." *Id.* The Second Group of Defendants argue that in the context of the '293 Patent, making an application program "available for use" involves designating which applications are authorized with respect to individual users. *Id.* (citing '466 Patent at 18:7–15, 17:62–67, 19:22–29).

Replying to the arguments of the First Group of Defendants, Plaintiffs contend that nowhere do the inventors state or imply an application executing at the server is not an

"application." Docket No. 190 at 5. Plaintiffs argue that the statements in the '466 Patent requiring execution at the client arise from the language in the claims explicitly imposing that requirement, which does not appear in the claims of '578 or '293 Patents. *Id.* Plaintiffs further argue that if the PTO determines two inventions in a single application are subject to restriction, then the claims of one patent do not have to embrace limitations contained in claims of the other. *Id.* Plaintiffs also contend that the servers are described as "on-demand" because they respond only when a request (demand) is received from a user selecting an application for execution, not because of where the application would be executed. *Id.* According to Plaintiffs, "deliver" in the agreed construction of "on-demand server," was intended to encompass both downloading and delivering for execution at the server. *Id.* at 5-6.

Replying to the arguments of the Second Group of Defendants, Plaintiffs contend that the passage relied on by the group describes the disclosed step as an "example," where "server 22 may be configured . . . ." *Id.* (citing '466 Patent at 18:10–11). Plaintiffs further contend that a second passage the Second Group of Defendants relied on has the same deficiency. Docket No. 190 at 6 (citing '466 Patent at 17:62–67). According to Plaintiffs, the inventors added the disputed language to clarify the application should be not only delivered to the server, but also registered "in a manner which makes it recognized and available to users." Docket No. 190 at 6.

For the following reasons, the Court finds that the phrase **"make the application program available for use"** should be given its **plain and ordinary meaning**.

### b) Analysis

The phrase "make the application program available for use" appears in claims 1, 12 and 17 of the '293 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. Before the Court ordered supplemental

briefing for this term, all of the Defendants agreed to a single construction. After the supplemental briefing, Defendants are divided into three groups. Kaspersky Lab now agrees with Plaintiffs. Docket No. 185 at 4 n.1. The First Group of Defendants maintain the previous construction, and the Second Group of Defendants propose a new construction for the phrase. Docket No. 185 at 12–13. Unlike their previous construction, the Second Group of Defendants' construction does not require an application program be available for "download."

The Court finds that the phrase "make the application program available for use," should be given its plain and ordinary meaning. The phrase is not ambiguous or confusing to a jury. Moreover, the phrase appears in the claims of the '293 Patent, which relates to the transmission of applications from a central management server to another server and does not involve a client. *See, e.g.*, '466 Patent at 17:60–62 ("The application program software is then distributed by Tivoli™ server 20 to specified on-demand servers 22, 22' at block 116."). The specification states "[a]ccordingly, with a request from a single Tivoli™ server 20 location, an administrator both sends a new application package to all supported on-demand servers and installs the program and *configures (registers) it to be available for use*." *Id.* at 18:26–29 (emphasis added).

Furthermore, the intrinsic evidence does not indicate that "use" should be redrafted as "access and download, responsive to user requests," as the First Group of Defendants propose. The claims of the '293 Patent require "distributing the file packet to the target on-demand server to make the application program available for use by a user at a client." As indicated, the claims recite that the application program is available for use, and do not further recite how the users use the application program. Simply stated, Defendants' construction would read an unwarranted limitation into the claims of the '293 Patent.

The First Group of Defendants argue that no embodiment of an on-demand server

expressly describes the remote "use" of an application on a server. Docket No. 185 at 10. The First Group of Defendants further argue that during the prosecution of the '466 Patent the patentee made multiple statements characterizing the invention as accessing and downloading selected application programs for local execution at the client. *Id.* The Court disagrees that the patentees made a clear and unambiguous disclaimer in the prosecution history regarding "available for use." Indeed, the patentees distinguished certain prior art by pointing out the claim (that would become claim 1 of the '293 Patent) recited "an exchange, *not involving a client*, to enable availability of a program" at a target on-demand server. Docket No. 140-6 at 10 (emphasis added). As discussed above, the claims recite that the application program is available for use, and do not further recite how the users use the application program. Moreover, the phrase appears in the claims of the '293 Patent, which relate to the transmission of applications from a central management server to another server, and does not involve a client.

The First Group of Defendants also argue that the patentees defined "application programs" in the '466 Prosecution as application level software programs that "execute[] locally at the client as a separate application from the browser interface." Docket No. 185 at 11. The First Group of Defendants focus on an incomplete portion of the patentees' statement. The patentees argued that "the application launcher program interacts with the desktop, such as a user browser interface, *while an instance of the application program is requested through the desktop but executes locally at the client* as a separate application from the browser interface." Docket No. 150-5 at 25, 50. As indicated, it is "an instance of the application program" that "executes locally at the client," not the recited "application program." Moreover, the claims of the '293 Patent relate only to the transmission of applications from a central management server to another server and do not involve a client or executing an instance of the application program locally. As with the

term "application program," this proposal would be an unwarranted reading of a "download" limitation into the phrase "make the application program available for use."

The Second Group of Defendants argue that in the context of the '293 Patent, making an application program "available for use" involves designating which applications are authorized with respect to individual users. Docket No. 185 at 13. The Court agrees that this is one disclosed embodiment. However, the intrinsic evidence indicates that this is not the only embodiment and presents this embodiment as an "example," where "server 22 may be configured . . . ." '466 Patent at 18:10–11. Accordingly, the Court does not adopt the Second Group of Defendants' construction.

### c) Court's Construction

The phrase **"make the application program available for use"** will be given its **plain and ordinary meaning**.

### 4. "registration operations"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "registration operations" | "registration of the application program at the target on-demand server so that it will be available to users from client computers" | "registration of the application program at the target on-demand server(s) so that it will be available for access and download responsive to user requests from client computers" |

### a) The Parties' Positions

The parties dispute whether "registration operations" require making the application program "available for access and download responsive to user requests from client computers," as Defendants contend. Plaintiffs argue that there are two ways a user can execute an application in the network described in the Asserted Patents. Docket No. 140 at 4. The first method includes downloading and executing an application on the client terminal. *Id.* Plaintiffs agree that the asserted claims of the '466 Patent, and claims 3, 9 and 15 of the '766 Patent, are drawn to this first

method.  *Id.*  The second method includes the application remaining on the server and being executed remotely by a user.  *Id.*  Plaintiffs contend that the claims of the '293 Patent cover both methods.  *Id.*

Plaintiffs argue that all claims of the '466 Patent, and claims 3, 9 and 15 of the '766 Patent, recite language that unambiguously requires execution on the client.  *Id.* at 5.  Plaintiffs contend that no similar language appears in the claims or prosecution history of the '578 or '293 Patents.  *Id.*  Plaintiffs further argue that the claims of the '293 Patent are directed to an exchange of applications from a central management server to the remote servers, not from the remote server to the client.  *Id.*  Plaintiffs contend that those claims do not even mention executing the application program.  *Id.*

According to Plaintiffs, nothing in the ordinary and usual meaning of "registration operation" would limit the term to only programs that are "download[ed]."  Plaintiffs contend that applications are frequently executed at remote servers.  *Id.* at 6.  Plaintiffs argue that the intrinsic record of the '578 and '293 Patents does not contain a definition or disclaimer that would limit the claims to only programs that are "download[ed]."  *Id.* at 7.

Defendants respond that applications in all of the Asserted Patents are downloaded to client computers for execution.  Docket No. 150 at 14.  Defendants argue that Plaintiffs' construction omits any description of the "operations" that are involved in "registration," allowing it to pursue an unreasonably broad reading of this term.  *Id.* at 18.  Defendants contend that "registration" entails making an application available for access and download responsive to user requests from client computers.  *Id.* (citing '466 Patent at 4:17–21, 18:26–29).  Defendants further argue that the patentees explained during prosecution of the '293 Patent that "registering the application programs at the on-demand server(s)" results in them "be[ing] available to users accessing the

programs from client computers." Docket No. 150 at 18 (citing Docket No. 150-7 at 9). Defendants also contend that the Asserted Patents and their prosecution histories further make clear that this core aspect of registration operation comprises making them "available for access and download responsive to user requests from client computers." Docket No. 150 at 18 (citing '293 Patent at 7:65–67; Docket No. 150-5 at 49).

Plaintiffs reply that the four patents are directed towards four different inventions, with each invention relating to a particular portion of an enterprise computer network. Docket No. 155 at 2. Plaintiffs contend that all of the claims of the '466 Patent incorporate specific language requiring execution at the client. *Id.* Plaintiffs further contend that the claims of the '578 and '293 Patents are directed toward inventions that can be practiced in networks where execution is at a server. *Id.*

Plaintiffs further argue that the '293 Patent is a divisional of the '466 Patent and is directed to "distribution of application programs to a target station on a network." *Id.* at 6. Plaintiffs contend that all claims of the '466 Patent have language unambiguously requiring execution at the client and that the '293 Patent does not involve a client. *Id.* at 7. Plaintiffs further argue that embodiments in the shared specification that are executed at the client correspond to the distinct invention of the '466 Patent, and where applications are executed is not mentioned in the '293 Patent. *Id.* (citing '466 Patent at 17:17–20:59).

Regarding the prosecution history, Plaintiffs argue that the prosecution history of the '466 Patent can be disregarded because the claim construction issue is limited to claims of the '578 and '293 Patents. Docket No. 155 at 7. Plaintiffs contend that the requirement of execution at the client in the '466 Patent arises from specific language in the '466 Patent's claims requiring execution at the client. *Id.* at 8. According to Plaintiffs, the statements in the prosecution history

of the '466 Patent have no relevance to the '578 Patent. *Id.*

Plaintiffs further argue that the prosecution history of the '766 Patent also forms no part of the prosecution history of the '578 Patent or the '293 Patent and should be disregarded. *Id.* Plaintiffs contend that the relevant claims in the '766 Patent prosecution covered a method or system in which an application launcher program located on the client requests a license availability from a server, and then receives from the server an indication of availability or unavailability. *Id.* at 8–9. Plaintiffs argue that the relevant claims did not discuss execution and did not distinguish any of those references based on where execution is performed. *Id.* at 9. Plaintiffs also argue that the patentees did not distinguish Franklin on the grounds that its applications were executed on the server, but instead distinguished Franklin on the ground that the application launcher was located on the server. *Id.*

Plaintiffs also contend that the comments regarding the Duvvoori reference was that the reference did not disclose "a configurable instance of an application . . . for execution at the client." *Id.* According to Plaintiffs, the patentees did not distinguish the prior art references on the ground that applications would be executed at the server, because in both references the applications were executed at the client, not the server. *Id.* at 9–10 (citing Docket No. 155-3 at 4, 6). Plaintiffs contend that the patentees similarly described Duvvoori as describing "an agent process . . . at the client that controls execution programs resident on the clients." Docket No. 155 at 10 (citing Docket No. 155-4 at 4). Plaintiffs argue that the patentees never described either reference as executing programs at the server. Docket No. 155 at 10. Plaintiffs also argue that the patentees' statement distinguishing Duvvoori related to that reference not having an application launcher located on the client. *Id.*

For the following reasons, the Court finds that the term **"registration operations"** should

be construed to mean **"registration of the application program at the target on-demand server(s)."**

### b) Analysis

The term "registration operations" appears in claims 1, 12 and 17 of the '293 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further finds that "registration operation" refers to "registration of the application program at the target on-demand server(s)," as the parties now appear to agree. Plaintiffs originally contended that it was a registration of the "file packet" on the target on-demand server. Docket No. 140 at 6. The Court disagrees. As discussed above, the '293 Patent relates to the transmission of applications from a central management server to another server. *See, e.g.*, '466 Patent at 17: 60–62 ("The application program software is then distributed by Tivoli™ server 20 to specified on-demand servers 22, 22' at block 116."); 4:13–17 ("A profile manager import call is included in the distributed file packet along with an import text file containing the data required to properly *install and register the application program on the on-demand server* and make it available to authorized users.") (emphasis added); 5:35–38 ("A file packet associated with the application program is prepared including a segment configured to initiate *registration operations for the application program* at the target station.") (emphasis added). Accordingly, to the extent that Plaintiffs contend that the "registration operation" is the registration of "the file packet," the Court rejects that argument.

The parties also dispute whether the application program must "be available for access and download responsive to user requests from client computers," as Defendants propose. Defendants contend that "making applications 'available to users' and 'on-demand'– comprises making them 'available for access and download responsive to user requests from client computers." Docket

No. 150 at 18. The Court disagrees. The "registration operation" relates to the transmission of applications from a central management server to another server, and does not involve the transmission of the applications to the client. For example, claim 12 recites "means for preparing a file packet associated with the application program, the file packet including a segment configured to initiate registration operations for the application program at the target on-demand server." A separate limitation in claim 12 address availability. Specifically, claim 12 further recites "means for distributing the file packet to the target on-demand server to make the application program available for use by a user at a client." Thus, making the application program available to a user is a separate limitation, and indicates that an "access and download" limitation should not be read into the term "registration operations."

The specification further confirms that the "registration operation" relates to the transmission of applications from a central management server to another server, and does not involve downloading to a user. The specification states that "[a]s will be understood from the above description, the present invention allows development and deployment of managed applications which are deployed to servers rather than to individual clients." '466 Patent at 16:61–64. In describing Figure 10, the specification provides the example of "an import file name . . . [that] allow[s] for automatic installation and registration of the new application program at each of the target on-demand servers 22, 22'." *Id.* at 19:1–5.

The intrinsic evidence further indicates that once the "registration operation" is complete, the application program will be "available for use by a user at a client," as recited in the claims. For example, the specification states that "the applications are defined and access is controlled centrally which provides control over various versions of software so that the latest software may always be served on-demand to the end-users." *Id.* at 16:64–67. However, as discussed above,

this is a separate claim limitation, and does not warrant reading an "access and download" limitation into the term "registration operations."

Defendants argue that that the prosecution history supports their construction. During the prosecution history, the patentee argued that "[a]s is clear from the highlighted recitations of Claim 15, the claimed embodiments of Claim 15 are directed to distribution of application programs from a network management computer to on-demand server(s) and to registering the application program at the on-demand server(s) so that they will be available to users accessing the programs from client computers." Docket No. 150-7 at 9. The Court disagrees that a person of ordinary skill in the art would read this statement as requiring the "registration operation" to include downloading from a client computer. The patentees' argument repeats the claim language, which does not recite "downloading by the client" as it relates to the "registration operation." Accordingly, the Court rejects this aspect of Defendants' construction.

### c) Court's Construction

The Court construes the term **"registration operations"** to mean **"registration of the application program at the target on-demand server(s)."**

### 5. "the initiating execution step"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "the initiating execution step" | Claim 6 adds to claim 1 two limitations: A) storing a user set and an administrator set on a storage device, before initiating the execution, and then B) retrieving the stored sets in initiating the execution.<br><br>Claim 8 adds to claim 1 the limitation: obtaining default preference values in initiating the execution. | Indefinite |

### a) The Parties' Positions

The parties dispute whether dependent claims 6 and 8 of the '578 Patent are invalid because the term "the initiating execution step" lacks antecedent basis. Defendants argue the term "the initiating execution step" has no explicit antecedent basis, because neither claim 1, nor the remaining sections of claims 6 or 8, recites a preceding step of "initiating execution." Docket No. 150 at 19. Defendants contend that claim 1 only recites the step of "executing the application program." *Id.* According to Defendants, it is unclear whether claims 6 and 8 add a new step of "initiating execution" to the claimed method, add the retrieval of preferences to the already-claimed step of "executing the application program" or add separate "initiating" and "retrieving"/"obtaining" steps to claim 1. *Id.* Defendants contend that each possible interpretation is plausible, and each gives the claims a different scope, rendering the claims indefinite. *Id.*

Defendants further argue that the '578 Patent does not resolve the ambiguity. *Id.* Defendants contend that some passages suggest that there is a precursor step before execution begins in which preferences are obtained. *Id.* at 19–20 (citing '578 Patent at 4:9–14, 10:23–32). Defendants further contend that other passages suggest that default preferences and user preferences are obtained as part of execution of the application itself. Docket No. 150 at 20 (citing '578 Patent at 9:43–46, 11:16–22). Defendants argue that the metes and bounds of the claim are not reasonably clear because an accused infringer of claims 6 and 8 has no clear indication of where, when, or by what entity the claimed "retrieving" or "obtaining" of preferences must be performed. Docket No. 150 at 20.

Defendants also argue that Plaintiffs' proposal results in more confusion because it introduces the phrase "initiating the application." *Id.* Defendants contend that it remains unclear (1) whether "initiating the application" is a separate step that must be performed for infringement, a component of the claimed step of "executing the application program," or a mere predicate

condition on execution; (2) whether "initiating the application" occurs immediately upon application execution, or if it occur days or even weeks in advance; or (3) whether the same entity that initiates the application program must also execute the program, or if different entities perform these steps. *Id.* at 20–21. Defendants argue that this ambiguity is inherent in the faulty manner in which these claims are drafted and cannot be cured during claim construction. *Id.* at 21.

Plaintiffs respond that claim 1 includes a step of executing an application, using certain sets of configurable preferences. Docket No. 155 at 10. Plaintiffs argue that claim 6 adds two limitations: (1) storing those sets on a storage device, before initiating the execution and then (2) retrieving the stored sets in initiating the execution. *Id.* Plaintiffs contend that if claim 6 recited "initiating the step of execution," instead of "the initiating execution step," Defendants would have no argument. *Id.* Plaintiffs argue that claim 6, written either way, adds the same two unambiguous limitations and has the identical scope. *Id.* at 11. Plaintiffs further contend that even if the Court were to find that the current language introduces an ambiguity, the Court has the authority to correct an error in a patent rather than find a claim indefinite. *Id.* (citing *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003)). Finally, Plaintiffs argue that the analysis is the same with respect to claim 8, which adds the limitation of obtaining default preference values in initiating the execution. Docket No. 155 at 11.

For the following reasons, the Court finds that claims 6 and 8 of the '578 Patent are not indefinite. Claim 6 requires (1) the step of storing the obtained user set and the obtained administrator set on a storage device coupled to the server, and (2) the step of retrieving the stored user set and the stored administrator set from the storage device. Both steps occur after the steps of "obtaining a user set" and "obtaining an administrator set," but prior to the "step of executing" recited in claim 1. Claim 8 requires: (1) the step of obtaining default preference values for any of

the plurality of configurable preferences which are not specified by the user set or the administrator set.  The step occurs prior to the "step of executing" recited in claim 1.

### b)  Analysis

Claims 6 and 8 of the '578 Patent depend from claim 1.  These claims recite that "the initiating execution step includes" steps of either retrieving stored sets of preferences (claim 6) or obtaining default preference values (claim 8).  The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.  The Court further finds that claim 1 does not provides explicit antecedent basis for the term "initiating execution step" in dependent claims 6 and 8.  However, the Court disagrees that the claims, read in light of the specification and prosecution history, fail to "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Starting with dependent claim 6, the Court finds that claim 1 provides antecedent basis for a number of terms that appear in claim 6.  For example, claim 1 provides antecedent basis for "the step of executing," "the obtained user set," "the obtained administrator set," and "the server." Moreover, claim 6 provides a logical, sequential order for performing the steps in light of the antecedent basis.  Claim 6 first recites that the additional steps are performed prior to the step of executing recited in claim 1.  Specifically, claim 6 recites "wherein the step of executing is preceded by . . . ."  It also follows that "the user set" and "the administrator set" recited in claim 1 cannot be stored until they are first obtained.  Likewise, the "stored user set" and "stored administrator set" cannot be retrieved until they are first stored.  Consequently, the "user set" and the "administrator set" cannot be used in the "step of executing" in claim 1 until they are first retrieved.  Thus, the steps in claim 6 must occur after the steps of "obtaining a user set" and

"obtaining an administrator set," but prior to the "step of executing" recited in claim 1.

The analysis of claim 8 is similar to claim 6. Claim 1 provides antecedent basis for terms that appear in claim 8. For example, claim 1 provides antecedent basis for "the plurality of configurable preferences," "the user set," and "the administrator set." Like claim 6, claim 8 provides a logical, sequential order for performing the steps. Claim 8 recites that default preferences values are obtained "for any of the plurality of configurable preferences which are not specified by the user set or the administrator set." The default preference values for the "user set" and the "administrator set" cannot be used in the "step of executing" in claim 1 until they are first obtained. Thus, claim 8 must occur prior to the step of executing.

The logical sequential ordering recited in the claims is further disclosed in the specification. The Abstract states the following:

> The application launcher program provides the identity of the user to the server along with the request to initiate execution of the application program. The on-demand server then initiates execution of the application program using stored values for the user and administrator set preferences or, if no preferences have yet been obtained for the particular user, obtains user preferences before initiating execution of the application program.

'578 Patent at Abstract. As indicated, the specification "initiates execution" by using stored values for the user and administrator set preferences. Figure 3 provides a flowchart for the management of configurable application programs on a network.



*Id.* at Figure 3. The specification states that "[o]n-demand server 22 receives a request to initiate execution of the application program at block 78." *Id.* at 10:6–7. The specification adds that the request received by server 22 allows it "to obtain the correct user specified preferences and provide a stored set of user and/or administrator preferences for the application program for a particular user." *Id.* at 10:12–15. The specification further states that "[i]f a requesting user is a new user, at block 82, the user's preferences for the application program are obtained from the user and stored

on a storage device coupled to server 22." *Id.* at 10:19–22. The specification also states that "[i]f new user preference settings are not required, stored user preference values associated with the authorized user as well as stored administrator and, when necessary, default values are obtained from memory as indicated at block 84." *Id.* at 10:26–29. The specification concludes that "[t]he application program is then executed at block 86 using the retrieved user set and administrator set of configurable preferences." The specifications description of Figure 3 tracks the claim language discussed above. Accordingly, the Court finds that the claims, read in light of the specification and prosecution history, informs, with reasonable certainty, those skilled in the art about the scope of the invention. *Nautilus*, 134 S. Ct. at 2124.

Defendants concede that the specification indicates that there may be a precursor step before execution begins in which preferences are obtained. Docket No. 150 at 20. Defendants argue that other passages suggest that default preferences and user preferences are obtained as part of execution of the application itself. *Id.* The Court agrees that the passage cited by Defendants indicates that "*[i]n another embodiment*, the application itself may contain default values coded into the application allowing the application itself to provide default values if no stored default values are available." '578 Patent at 9:43–46 (emphasis added). However, as discussed above, a person of ordinary skill would understand that the claims-at-issue are not directed to this embodiment, and provide a logical, sequential order for performing the recited steps in the other disclosed embodiments.

### c) Court's Construction

The Court finds that claims 6 and 8 of the '578 Patent are not indefinite. Claim 6 requires (1) the step of storing the obtained user set and the obtained administrator set on a storage device coupled to the server, and (2) the step of retrieving the stored user set and the stored administrator set from the storage device. Both steps occur after the steps of "obtaining a user set" and

"obtaining an administrator set," but prior to the "step of executing" recited in claim 1. Claim 8 requires: (1) the step of obtaining default preference values for any of the plurality of configurable preferences which are not specified by the user set or the administrator set. The step occurs prior to the "step of executing" recited in claim 1.

**6. "the computer readable program code means for executing the application program" / "the computer readable program code means for initiating execution" / "the means for executing the application program" / "the means for initiating execution"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "the computer readable program code means for executing the application program" / "the computer readable program code means for initiating execution" / "the means for executing the application program" / "the means for initiating execution" | Claim 35 is representative. Claim 35 adds to claim 32 the limitation: code that actually executes the application program. | Indefinite |

### a) The Parties' Positions

The parties dispute whether dependent claims 20, 22, 24, 35, 37 and 39 of the '578 Patent are invalid because the term "computer readable program code means for executing/initiating execution" and the term "the means for initiating execution" lack antecedent basis. Using claim 35 as an exemplary claim, Defendants argue that the claims refers to "the computer readable program code means for executing the application program" and specifies that it includes means for executing an application "responsive to a request . . . through the application launcher program." Docket No. 150 at 21. Defendants contend that no "computer readable program code means for executing" appears in any parent claim to claim 35. *Id.* Defendants argue that independent claim 32 refers to a "computer readable program code means for providing an

instance of the application program and a stored user set and the administrator set of the plurality of configurable preferences for use in executing the application program." *Id.* Defendants contend that it is unclear what structure is required by claim 35. *Id.*

According to Defendants, it is equally plausible that the structure could be the already-claimed structure for "providing an instance," or alternatively, a structure for "executing the application program." *Id.* Defendants argue that the difference between these interpretations is material to appropriate claim scope because, under the former interpretation, the accused products only need to include the "computer readable program code means for providing an instance of the application program," while under the latter interpretation, the accused products need to also include the "computer readable code means for executing the application program." *Id.* at 22.

Defendants concede that the '578 Patent discloses structure that is consistent with the "computer readable code means for executing the application program" being separate and in addition to the "computer readable program code means for providing an instance of the application program." *Id.* Defendants argue that the same disclosure also supports a single, server-based "computer readable program code means for providing an instance of the application program" that receives the claimed "request" from the launcher program. *Id.* (citing '578 Patent at 11:60–65). Defendants contend that the claim scope is indefinite because both of these interpretations are equally plausible, and one of ordinary skill in the art would not be able to determine which one to apply. Docket No. 150 at 22–23.

Defendants further argue that similar flaws are found in claims 20, 22, 24, 37 and 39. *Id.* at 23. Defendants contend that each is a dependent claim reciting a "means" not found implicitly or explicitly in a parent claim. *Id.* Defendants argue that the Court has no reason to select one plausible interpretation of these claims over another equally-plausible interpretation. *Id.*

Defendants also argue that the claims are indefinite because their meaning and scope are not reasonably certain. *Id.*

Plaintiffs respond that the disputed phrases are means-plus-function limitations. Docket No. 140 at 9. Plaintiffs argue that a person of ordinary skill in the art would understand that the structure corresponding to "computer readable program code means for executing the application program" would be the code (including its relevant algorithms) written to cause a processor to execute the application. *Id.* Plaintiffs also argue that the structure corresponding to "computer readable program code means for providing an instance of the application program . . . for use in executing the application program" from claim 32 would be the code written to cause the processor to provide an instance of the application for use in executing the application. *Id.* at 9–10. Plaintiffs contend that the structure that dependent claim 35 adds to the structures of claim 32 is the code written to cause the processor to execute the application. *Id.* at 10; Docket No. 155 at 11. According to Plaintiffs, the relevant code of claim 32 provides an executable copy of the program for use in executing the application, and the code of claim 35 actually executes the program. Docket No. 140 at 10; Docket No. 155 at 11. Plaintiffs contend that the analysis is identical for the other claims Defendants cite. Docket No. 140 at 10.

For the following reasons, the Court finds that claims 20, 22, 24, 35, 37 and 39 of the '578 Patent are indefinite because they fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### b) Analysis

The terms "computer readable program code means for executing/initiating execution" and the term "the means for initiating execution" appear in either claims 20, 22, 24, 35, 37 or 39 of the '578 Patent. The parties agree that the disputed terms are drafted in "means-plus-function" format.

Docket No. 140 at 9. For means-plus-function limitations, the Court must construe the phrase to cover the corresponding structures disclosed in the specification that performs the claimed function. *Northrop Grumman Corp. v. Intel Corp.*, 325 F. 3d 1346, 1349-50 (Fed. Cir. 2003) ("In construing a means-plus-function limitation, a court must identify both the claimed function and the corresponding structure in the written description for performing that function.") (citing *Micro. Chem., Inc. v. Great Plains Chem. Co.,* 194 F. 3d 1250, 1258 (Fed. Cir. 1999)). Thus, lack of antecedent basis is problematic when it prevents a person of ordinary skill from determining the corresponding structure.

Here, the lack of antecedent basis renders the claims indefinite. For example, claim 35 refers to "the computer readable program code means for executing the application program," and specifies that it includes means for executing an application "responsive to a request . . . through the application launcher program." However, no "computer readable program code means for executing" appears in any parent claim to claim 35. Rather, independent claim 32 refers to a "computer readable program code means for providing an instance of the application program and a stored user set and the administrator set of the plurality of configurable preferences for use in executing the application program." Therefore, it is unclear what structure is required by claim 35.

The structure could be the claimed structure for "providing an instance," or, alternatively, it could be a structure for "executing the application program." The difference between these interpretations is material because, under the former interpretation, the scope of the claim includes only the "computer readable program code means for providing an instance of the application program," while under the latter interpretation, the scope of the claims also includes the "computer

readable code means for executing the application program."[7]  Because the scope of the claims are not reasonably certain to a person of ordinary skill, the claims are indefinite.

Similar flaws are found in claim 20 (which mirrors claim 35) and claims 22, 24, 37 and 39. Each is a dependent claim reciting a "means" not found implicitly or explicitly in a parent claim: "the means for initiating execution" (claims 22, 24) and "the computer readable program code means for initiating execution" (claims 37, 39).  However, no "computer readable program code means for initiating execution/executing" or "means for initiating execution" appears in any parent claims.  Thus, the scope of the claims is not reasonably certain to a person of ordinary skill, and the claims are indefinite.

### c) Court's Construction

Claims 20, 22, 24, 35, 37 and 39 of the '578 Patent are indefinite because they fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### 7. "license availability"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "license availability" | "determination that a user can be issued a license to the selected application program" | **ADP and Zendesk:**<br>"determination that a user can be issued a license to the selected application program, distinct from any determination that the user is authorized to access the selected application program"<br><br>**All other Defendants:**<br>"determination that a user can be issued a license to the selected application program." |

---

[7] The language of the claims also distinguishes between "providing" and "executing" the application programs.  *See, e.g.*, '578 Patent, claim 32 ("computer readable program code means for providing an instance . . . for use in executing . . . .").  Thus, means for providing may be unrelated to means for executing.

### a)  The Parties' Positions

The parties agree that "license availability" is a "determination that a user can be issued a license to the selected application program."  Defendants ADP and Zendesk further contend that "license availability" is "distinct from any determination that the user is authorized to access the selected application program."   Opposing this construction, Plaintiffs argue that defining something by saying what it is not is poor practice.  Docket No. 140 at 11.  Plaintiffs further contend that it could also mislead the jury by implying a claim does not cover licensing availability software that includes, as a first step in allocating licenses, determining which users are authorized. *Id.*

Defendants ADP and Zendesk respond that Plaintiffs do not addresses the disclosure of the Asserted Patents or the disclaimer from the prosecution history of the '466 Patent pertaining to this claim term.  Docket No. 150 at 24.  Defendants ADP and Zendesk argue that the claims of the '466 Patent on their face distinguish between "authoriz[ation]" and "license availability."  *Id.* Defendants ADP and Zendesk further argue that the described embodiments all treat "authoriz[ation]" and "license availability" as separate and distinct steps.  *Id.*  Defendants ADP and Zendesk contend that in the '466 Patent the on-demand server first "see[s] if the user is authorized to bring up," and in a second step "processes a license request to determine if a license is available for" that application.  *Id.* (citing '466 Patent at 13:50–56, 13:58–61, 15:37-39, 16:43–56, Figures 6–7).  Defendants ADP and Zendesk also contend that the '766 Patent similarly incorporates this distinction between "determin[ing] the license availability for the selected one of the plurality of application programs" and "determining if a user requesting execution of the application program is one of the plurality of authorized users."  Docket No. 150 at 25 (citing '578 Patent at 7:17–21, 4:62–67, 5:45–53).

Defendants ADP and Zendesk further contend that the patentees argued during the

prosecution of the '466 Patent that "verifying license availability" is "distinct" from "determining whether a user is authorized to access a resource." Docket No. 150 at 25 (citing Docket No. 150-5 at 13). Defendants ADP and Zendesk also contend that Plaintiffs' argument against negative limitations cannot overcome the express disclaimer set forth in the file history. Docket No. 150 at 26. Defendants ADP and Zendesk further contend that the jury will not be mislead by their construction. *Id.* According to Defendants ADP and Zendesk, the jury will be able to apply the Court's instructions on patent infringement and will understand the open-ended nature of patent claims. *Id.*

Plaintiffs reply that all parties agree that "license availability" means a determination that a user can be issued a license to the selected application program. Docket No. 155 at 12. Plaintiffs contend that this is not a claim construction issue but instead is a dispute over future jury instructions. *Id.* Plaintiffs argue that this issue is better addressed at a charge conference rather than a *Markman* hearing. *Id.*

For the following reasons, the Court finds that the term **"license availability"** should be construed to mean **"determination that a user can be issued a license to the selected application program."**

### b) Analysis

The term "license availability" appears in claims 9, 10, 24, 25, 37 and 38 of the '466 Patent and claims 1, 7 and 13 of the '766 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. Plaintiffs fail to address the substantive arguments made by Defendants regarding this term. The Court generally agrees with Defendants that the intrinsic evidence indicates that determining whether a user is authorized to access a selected application program is not the same as determining whether a license is

available to use a selected application program. However, the Court does not adopt Defendants' construction because it could imply that an authorization step is required, even when an authorization step is not recited in the claims. This would be contrary to the intrinsic evidence because the specification discloses embodiments where all users are authorized and embodiments where non-authorized users are allowed access. *See, e.g.*, '578 Patent at 8:26–29 ("[A]ll users may be considered authorized users for any particular application or a subset of the user known to server 22 may be designated as authorized users for a particular application program."); '466 Patent at 15:49–54 ("In other words, client management server 204 may be configured, based upon the properties provided by a software designer for a particular managed application, to initiate execution of an instance of an application by a non-authorized user while otherwise denying access to the application management capabilities . . . ."). Accordingly, to avoid confusion, the Court does not adopt Defendants' additional proposal.

However, to the extent a party argues that determining whether a user is authorized to access a selected application program is the same as determining whether a license is available to use a selected application program, the Court rejects that argument. The intrinsic evidence draws a distinction between authorization and license management. Generally speaking, the intrinsic evidence indicates that authorization is related to controlling access to an application program, whereas license management is related to usage of an application program. *See, e.g.*, '466 Patent at 10:57–58 ("User authorization 212 provides control over which applications may be accessed by a particular user or group."); 11:35–38 ("The license management component 216 thereby provides a convenient tool for tracking the usage of specified applications.").

For example, in describing Figures 6 and 7, the specification states that "[a]t block 264, the server system 22 checks the user's credentials to see if the user is authorized to bring up the

user desktop interface application," and that "[i]f the user is authorized, server system 22 processes a license request to determine if a license is available for the desktop application (block 268)." *Id.* at 13:50–60. In other words, a user could be authorized to use an application, but the available license may already be allocated. The patentees argued this distinction during the prosecution of the '466 Patent. Specifically, the patentee argued the following:

> With respect to Claims 9-11, Applicants again can find no discussion of the 'license availability' recitations of these Claims in the cited portions of Oh or in Bladow. *While Bladow does discuss determining whether a user is authorized to access a resource, this is distinct from the recitations of these claims related to verifying license availability.* For example, a user could be authorized to use an application but five instances of the application may already be executing and the server may only have a five concurrent user license. Thus, an authorized user could be denied an instance of a requested application because no license is available. (*See, e.g.*, Specification, p. 18, lines 1-9; p. 21, line 31 to p. 22, line 9). Accordingly, these claims are also patentable for at least these additional reasons.

Docket No. 150-5 at 13 (emphasis added). Accordingly, to the extent a party argues that determining whether a user is authorized to access a selected application program is the same as determining whether a license is available to use a selected application program, the Court rejects that argument.

### c) Court's Construction

The Court construes the term **"license availability"** to mean **"determination that a user can be issued a license to the selected application program."**

> **8. "an instance" / "an instance of the application program" / "an instance of the selected one of the plurality of application programs" and "provid[e]/[ing]"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "an instance" / "an instance of the application program" / "an instance of the selected one of the plurality of application programs" | A program is a sequence of instructions that indicates which operations the computer should perform on a set of data.<br><br>An instance of a program is a copy of a program that is understandable by a computer's central processing unit and that is ready to run as soon it is copied from storage into memory | **Kaspersky Lab**:<br>"instance" means "a copy of an executable version of the program that has been written to the computer's memory."<br><br>**All other Defendants:**<br>"program" - plain meaning; "instance" means "a copy" / "a copy of the application program" / "a selected copy of the application program" |
| "provid[e]/[ing]" | "provide" – plain and ordinary meaning | **Kaspersky, Ubisoft and Square Enix:**<br>"provid[e]/[ing]" - plain and ordinary meaning<br><br>**All other Defendants:**<br>"provid[e]/[ing]" means "download[ing]" |

### a) The Parties' Positions

The parties dispute whether an "instance" is a copy of the application program, as most Defendants propose, or whether it is a copy of an executable version of the program written to the computer's memory, as Plaintiffs and Defendant Kaspersky Lab generally propose. The parties also dispute whether the terms "program" and "providing" require construction. Plaintiffs argue that lay jurors will not understand the term "instance of a program." Docket No. 140 at 11. Plaintiffs contend that a document from the Linux Information Project forms the basis of its more specific proposals. *Id.* Plaintiffs further suggest that Defendants would go along with "an executable copy of an installed program." *Id.*

Defendants respond that they agree an instance is a "copy" of an application program, but disagree on the remaining constructions. Docket No. 150 at 28. Defendants argue that the claims of the '466, '578 and '766 Patents all use the term "instance" in accordance with its plain meaning. *Id.* Defendants contend that the claims of the '466, '578 and '766 Patents expressly require that

(1) an application program is first installed at the server used to manage application programs; (2) following that installation, a separate copy, or "instance," of the application program is provided to a client in response to a user request; and (3) this instance of the application program is then executed. *Id.* (citing '466 Patent at 21:20, 21:30–32, 21:33–35; '578 Patent at 16:60–62, 17:25–27, 17:3–8, 17:19–22).

Defendants further contend that the '466, '578 and '766 Patent specifications are consistent with this usage of the term "instance." Docket No. 150 at 28–29 (citing '466 Patent at 17:60–62, 9:52–55, 4:34–38, 16:18–25; '578 Patent at 7:62–65, 10:54–11:8, 11:60–12:1, 5:32–37). Defendants further argue that the term "instance" clarifies that each copy of an application program stored on an individual client is separate from the other copies stored on other clients, such that each copy can by executed by its respective client separately. Docket No. 150 at 29 (citing '466 Patent at 15:66–16:5). According to Defendants, each client has its own separate and complete instance, or copy, of the application program that was previously installed at the server. Docket No. 150 at 30.

Defendants argue that Plaintiffs' proposed "is understandable by a computer's central processing unit" introduces unnecessary complexity into the construction of "instance." *Id.* Defendants further contend that the remainder of Plaintiffs' proposed construction (*i.e.*, that an instance "is ready to run as soon it is copied from storage into memory") is not based on the intrinsic record of the '466, '578 or '766 Patents. *Id.* Defendants also contend that these patents set no temporal limit on when an instance of an application is or must be executed on the client. *Id.* Defendants argue that these patents only note that, once the instance of the application program is downloaded from a server to a client, at some point it can be executed at the client. *Id.* (citing '466 Patent at 4:34–38; '578 Patent at 11:60–12:1). Defendants also argue that Plaintiffs'

proposed language regarding copying "from storage into memory" may obfuscate how the claimed "instance" must be installed on a server (*e.g.*, an on-demand server) before it is provided/downloaded to the client for execution. Docket No.150 at 30.

Defendants further argue that Plaintiffs fail to identify a single citation from the intrinsic record in support of its apparent construction of "instance" or supplemental construction of "program." *Id.* at 31. Defendants contend that Plaintiffs rely exclusively on a non-contemporaneous piece of extrinsic evidence from the "Linux Information Project." *Id.* Defendants argue that the Court should strike or disregard this evidence. *Id.*

Defendants also contend that they offered construing "instance" as "an executable copy of an installed program" as a compromise construction because it is consistent with the plain and ordinary meaning of "instance" in view of the intrinsic record. *Id.* at 32. According to Defendants, the claimed "instance" is a copy of an application program that was previously installed on a server and which is provided to and executed on a client. *Id.* Defendants also argue that the term "program" does not appear in the claims outside its use in the term "application program" or "application launcher program." *Id.* Defendants contend that Plaintiffs' proposal is an attempt to introduce an untimely, new construction for the term "application program." *Id.*

Regarding the term "providing," the majority of Defendants ask the Court to further clarify that "providing" an instance of an application program means that the copy is downloaded from the claimed server to the client. *Id.* Defendants argue that the plain language of the claims supports their construction. *Id.* (citing '466 Patent at 21:33–35; '578 Patent at 16:51–52, 16:59, 17:3–4, 22:15–17). According to Defendants, the plain language of the claims consistently requires that the server provide the instance of the application program to the client. *Id.* at 33.

Defendants argue that the '466 and '578 Patent specifications are also consistent with their

proposed construction. *Id.* (citing '466 Patent at 4:34–38, 16:1–5; '578 Patent at 5:58–60, 10:9–12, 11:41–47, 12:1–6, 11:43–47). Defendants contend that the specification clarifies that "providing" means "downloading." Docket No. 150 at 33 (citing '466 Patent at 3:55–4:1). Defendants argue that the "Summary of the Invention" section of the '466 Patent states that, according to the "present invention," "[t]he desktop accesses and downloads selected application programs from the server responsive to a request from the user, such as the selection of an icon associated with the application program which is displayed on the user desktop screen at the client." Docket No. 150 at 34 (citing '466 Patent at 3:55–4:1).

Defendants further argue that the specifications consistently refer to provision of programs from the server to the client as "downloading." Docket No. 150 at 34 (citing '466 Patent at Abstract, 14:20–23, 12:42–52; '578 Patent at 12:1–6). Finally, Defendants argue that the patentees repeatedly reaffirmed during prosecution of the '466 Patent that the claimed providing of applications takes place between the server and client. Docket No. 150 at 34 (citing Docket No. 150-5 at 8, 25, 41, 49).

Plaintiffs reply that the parties seem to agree what an "instance of a program" means to those in the art. Docket No. 155 at 12. Plaintiffs argue that Defendants (other than Defendant Kaspersky Lab) want the Court to give nothing more than the unhelpful statement that an "instance" is a "copy." *Id.* Plaintiffs state that they agree with Defendant Kaspersky Lab's arguments. *Id.* at 12–13.

For the following reasons, the Court finds that the term **"instance"** should be construed to mean **"an executable copy of the application program."** The Court further finds that the terms **"program"** and **"provid[e]/[ing]"** should be given their **plain and ordinary meaning**.

### b) Analysis

The terms "instance" and "program" appear in claims 1, 14, 15, 16, 19, 28 and 41 of the '466 Patent; claims 3, 9 and 15 of the '766 Patent; and claims 15–17, 31–32 and 46 of the '578 Patent. The Court finds that the terms are used consistently in the claims and are intended to have their respective meanings in each claim. The term "provid[e]/[ing]" appear in claims 1, 15 and 16 of the '466 Patent; claims 3, 9 and 15 of the '766 Patent; and claims 15, 16, 17, 32 and 46 of the '578 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.

The Court further finds that "instance" should be construed to mean "an executable copy of the application program." Generally speaking, the intrinsic evidence indicates that (1) an application program is first installed at the server used to manage application programs; (2) an executable copy, or "instance," of the application program is then provided in response to a user request; and (3) the instance of the application program is then executed. For example, the specification states that "[t]he application program software is then distributed by Tivoli™ server 20 to specified on-demand servers 22, 22' at block 116." '466 Patent at 17:60–63; *see also* '578 Patent at 7:63–65 ("[T]he application program may be provided to on-demand server 22 from a central location such as Tivoli™ server 20."). A user may then select one of the application programs by clicking on an icon displayed by an application launcher program. *See, e.g.*, '466 Patent at 9:52–55 ("Upon selection of the icon displayed by the application launcher, the selected application is 'launched' by requesting the URL of the application from the on-demand server."); '578 Patent at 10:58–63 ("The display icon is displayed through the browser's graphic user interface representing the users' desktop and allowing an authorized user to execute an application program by selecting the displayed icon of the application launcher program, typically through use of a mouse.").

The on-demand server then receives the request from the client, and provides an instance of the application to the requesting client for execution. *See, e.g.*, '466 Patent at 4:34–38 ("The server receives a selection of one of the plurality of application programs from the user desktop interface and *provides an instance of the selected one of the plurality of application programs* to the client for execution responsive to the selection.") (emphasis added); '578 Patent at 11:60–12:1 ("The application launcher applet then detects selection by the user of the application program's associated icon from the user desktop interface at clients 24, 24', 26, 26' and *requests an instance of the selected one of the plurality of application programs* associated with the icon from server system 22. The application launcher program then populates clients 24, 24', 26, 26' *with the instance of the selected application program for execution*.") (emphasis added); '466 Patent at 16:23–25 ("The application launcher program then populates client station 202 *with the instance of the selected application program for execution*.") (emphasis added); '578 Patent at 5:31–37 ("T*he server is also requested to provide an instance of the application program* and a stored user set and an administrator set of the plurality of configurable preferences for use in executing the application program responsive to a request from the one of the plurality of authorized users.") (emphasis added).

The specification further explains that an "instance" of the application is provided because the application program may be executed by multiple users concurrently. '466 Patent at 15:66–16:5 ("As the application program supported by server system 22 may be executable via a variety of users concurrently, server system 22 provides an instance of the selected one of the plurality of application programs to populate the application launcher to client station 202 for execution responsive to a selection of the application program from the user."). Accordingly, the intrinsic evidence indicates that "instance" means "an executable copy of the application program."

The Court does not adopt Plaintiffs' and Defendant Kaspersky Lab's construction because it adds unnecessary complexity to the construction of "instance." *See, e.g., Invensys Sys., Inc. v. Emerson Elec. Co.*, 63 F. Supp. 3d 663, 676 (E.D. Tex. 2014) (rejecting a "proposal [that] is unnecessarily complex and complicates an easily understood phrase"). For example, the claims recite the necessary server and client without introducing a "computer's memory," or types of memory into the claims. Moreover, the remainder of Plaintiffs' construction (*i.e.*, that an instance "is ready to run as soon it is copied from storage into memory") is not based on the intrinsic record of the '466, '578 or '766 Patents. The intrinsic evidence sets no temporal limit on when an instance of an application is or must be executed on the client. Rather, the specification states that once the instance of the application program is downloaded from a server to a client, it may be executed at the client. *See, e.g.*, '466 Patent at 4:34–38 ("The server receives a selection of one of the plurality of application programs from the user desktop interface and provides an instance of the selected one of the plurality of application programs to the client for execution responsive to the selection."); '578 Patent at 11:65–12:1 ("The application launcher program then populates clients 24, 24', 26, 26' with the instance of the selected application program for execution.").

Regarding the extrinsic evidence cited by Plaintiffs and Defendant Kaspersky Lab, the Court finds that it is generally consistent with the Court's construction. The Linux Information Project Document states that "[a]n instance of a program is a copy of an executable version of the program that has been written to the computer's memory." Docket No. 140-8 at 2. The document further states that "[a]n instance of a program is typically created by a user clicking on an icon (i.e., small image) on a GUI (graphical user interface) or by entering a command at the command line and then pressing the ENTER key." *Id.* As discussed above, the specification explains that an "instance," or executable copy of the application, is provided because the application program

may be executed by multiple users at the same time.  '466 Patent at 15:66–16:5.  Accordingly, the Court construes "instance" to mean "an executable copy of the application program."

Regarding the term "program," the Court finds that it should be given its plain and ordinary meaning.  The term "program" does not appear in the claims outside of its use in the term "application program" or "application launcher program."  The Court has construed these terms separately.  Moreover, Plaintiffs has not provided a persuasive reason to construe the term "program" as it proposes.

Regarding the term "provid[e]/[ing]," the Court finds that the term should be given its plain and ordinary meaning.  Defendants argue that the claim language and specification is consistent with their proposed construction.  Docket No. 150 at 32–34.  Although it may be consistent, the Court is not persuaded that the term "providing" should be redrafted as "downloading."  The claim language does not recite "downloading," and there is nothing confusing with the phrase "providing . . . to the client."  The specification repeatedly uses the term "providing" and does not indicate that it should be replaced with "downloading" in the claims.  For example, the '466 Patent describes that the "server . . . provides an instance of the selected one of the plurality of application programs to the client for execution . . . ."  '466 Patent at 4:34–38.  Similarly, the '578 Patent describes the "server associated with the client which provides an instance of the selected one of the application programs to the client for execution."  '578 Patent at 5:58–60, *see also id.* at 10:9–12, 11:41–47, 12:1–6.  The specifications further state that the server "provides an instance of the selected one of the plurality of application programs to populate the application launcher."  '466 Patent at 16:1–5; '578 Patent at 11:43–47.  As indicated, there is nothing confusing or ambiguous with the term "providing."

Defendants further argue that the applicants repeatedly reaffirmed during prosecution of

the '466 Patent that the claimed providing of applications takes place between the server and client. Specifically, the patentee argued that "[t]he application program is then provided from the server and executed at the client." Docket No. 150-5 at 25; *see also id.* at 49 ("An 'instance of the selected' application program is then provided from the server for execution at the client."). Consistent with the other intrinsic evidence, the patentees used the term "provided," not "downloading." Accordingly, the Court will not redraft the claim language as Defendants propose. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The Court construes the term **"instance"** to mean **"an executable copy of the application program."** The terms **"program"** and **"provid[e]/[ing]"** will be given their **plain and ordinary meaning**.

### VI. CONCLUSION

The Court adopts the constructions above for the disputed and agreed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**It is SO ORDERED.**
**SIGNED this 16th day of August, 2017.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE